# In the United States Court of Federal Claims

STEEL POINT SOLUTIONS, LLC,

Plaintiff,

v.

THE UNITED STATES,

Defendant,

and

SOFITC3, LLC, et al.,

Intervenor-Defendants.

No. 25-cv-1670

Filed Under Seal: March 3, 2026

Publication: March 19, 2026[1]

*Donald J. Walsh* of RKW, LLC, Washington, D.C., argued for Plaintiff.

*An Hoang* of the United States Department of Justice, Civil Division, Washington, D.C. argued for Defendant. With him on the briefs were *Brett A. Shumate*, *Patricia M. McCarthy* and *Douglas K. Mickle* of the United States Department of Justice, Civil Division, Washington, D.C., and *Victoria Roth* and *Jeffrey D. Webb* of the United States Department of Homeland Security.

*Jeffery M. Chiow* of Greenberg Traurig, LLP, Washington, D.C., argued for Intervenor-Defendant SOFITC3, LLC. With him on the briefs were *Eleanor M. Ross* and *Olivia C. Bellini* of Greenberg Traurig, LLP, Washington, D.C.

*Daniel J. Strouse* of Cordatis LLP, Arlington VA, argued for Intervenor-Defendant AttainX, Inc. With him on the briefs were *Pablo Nichols* and *Samuel Van Kopp* of Cordatis LLP, Arlington VA.

*Shane J. McCall* of Koprince McCall Pottroff LLC, Lawrence, KS, argued for Intervenor-Defendant Electrosoft Services, Inc.

*Lars E. Anderson* of Odin, Feldman & Pittleman, P.C., Reston, VA, for Intervenor-Defendant SiloSmashers, Inc. With him on the briefs were *Charlotte R. Rosen* and *Lauren P. Farrar* of Odin, Feldman & Pittleman, P.C., Reston, VA.

---

[1] This Memorandum and Order was filed under seal, in accordance with the Protective Order entered in this case, on March 3, 2026. ECF No. 8. On March 17, 2026, the parties filed a Joint Notice proposing redactions to the Memorandum and Order. The sealed and public versions of this Memorandum and Order are identical, except for some redactions, this footnote, the addition of agency counsel's name, the correction of Intervenor-Defendant SOFITC3, LLC's counsel's name, and the addition of the publication date.

**MEMORANDUM AND ORDER**

Plaintiff Steel Point Solutions, Inc., a disappointed bidder, brings this bid protest after failing to obtain a contract award from the United States Department of Homeland Security (DHS) Cybersecurity and Infrastructure Security Agency (CISA or Agency).  After soliciting quotations for an IT Professional Services contract, CISA received quotes from 37 offerors.  Subsequently, the Agency established a competitive range, which included the top four quotes in its evaluation.  Plaintiff, which did not make the cut for inclusion in the competitive range, filed a protest at the Government Accountability Office (GAO), along with two other bidders.  The Agency then included those three protestors in the competitive range, resolving the GAO protest and resulting in a competitive range of seven bidders.  Ultimately, the Agency selected for the award the top four bidders in the competitive range—the same four the Agency had originally included in the competitive range and whose quotes the Agency had ranked highest.

Plaintiff's protest followed and the four awardees intervened in this action.  Plaintiff alleges the Agency acted irrationally by (i) providing only a post hoc rationalization of its award decisions, (ii) treating its quote disparately compared to other bidders, and (iii) acting contrary to the terms of the Request for Quote (RFQ).  Defendant contends that the Agency's evaluation was reasonable; that it acted rationally with respect to all three points alleged by Plaintiff; and that Plaintiff has not established prejudice.

As described fully below, Plaintiff fails to establish that the Agency's actions were arbitrary or capricious, contrary to the RFQ, or otherwise unlawful.  Accordingly, the Court denies Plaintiff's Motion for Judgment on the Administrative Record (ECF Nos. 54 and 57), and grants Defendant's and the four Intervenor-Defendants' respective Motions for Judgment on the Administrative Record (ECF Nos. 58, 60, 61, 62, 65).

I.      **Background and Procedural History**

This post-award bid protest arises from RFQ Number 70RCSJ23Q00000005 issued by the Department of Homeland Security (DHS), CISA.  ECF No. 38 (Am. Compl.) ¶ 13.  "The opportunity was reserved for Woman-Owned Small Business (WOSB) vendors who have a GSA [Multiple Award Schedule] of SIN 54151S - IT Professional Services and SIN 54151HACS - Highly Adaptive Cybersecurity Services."  *Id.* ¶ 15.  The RFQ "sought to procure digital transformation support services for CISA, including program management, information technology infrastructure, enterprise data management, cybersecurity, and support for the adoption of new technology."  ECF No. 58 (Def. MJAR) at 8 (citing Tab 27d, AR 370–71).  The Agency sought to award "approximately four" Blanket Purchase Agreements.  Tab 27, AR 356.

Awards were to be made on a "best value" basis according to six evaluation factors: Factor 1 – Top/Secret Facility Clearance, Factor 2 – Technical, Factor 3 – Management Approach, Factor 4 – Key Personnel, Factor 5 – Past Performance, and Factor 6 – Price.  Tab 27, AR 356–61.  The RFQ explains:

> Factor 1 is a pass or fail requirement. Factor 2 – Technical is more important than Factor 3 – Management Approach, which is more important than Factor 4 – Key Personnel.  When combined, Factors 2–4 are significantly more important than Factor 5 - Past Performance, which is the least important factor.  All nonprice factors, when combined, are significantly more important than Factor 6 Price.

Tab 27, AR 357.  To evaluate Factors 2–4, the Agency would apply adjectival ratings ("Superior," "Good," "Satisfactory," "Marginal," or "Unsatisfactory").  Tab 27, AR 358–59.  Factor 5 (Past Performance) had a different adjectival range: "Neutral," "Superior," "Satisfactory," or "Unsatisfactory."  Tab 27, AR 360.  These Past Performance ratings reflected the likelihood that a bidder would "successfully perform the required effort."  *Id.*  Finally, Factor 6 (Price) was not assigned an adjectival rating; rather, the Agency would review Price for inconsistencies and reasonableness.  *See* Tab 27, AR 361.  If two quotes were "substantially equivalent" in other

aspects, then Factor 6 (Price) became more important.  Tab 151, AR 3254.  However, the RFQ noted that if the Agency determined "a price premium [was] warranted due to technical merit," it could award to a higher-priced bidder.  *Id.*

The RFQ closed on June 21, 2023, and 37 offerors submitted timely quotations.  *Id.* at AR 3253.  The Contracting Officer (CO) established a competitive range comprising the four highest-rated offerors (which became the eventual awardees).  *Id.* at AR 3258.  Notably, the Agency ranked Plaintiff 22nd of the 37 offerors—nowhere close to the top four quotes the CO included in the competitive range.  *Id.* at AR 3259.

Plaintiff and two other bidders that fell outside the competitive range protested at the GAO.  Tab 149, AR 3180; Tab 63, AR 2066.  Rather than litigate at the GAO, the Agency undertook voluntary corrective action: it included those three protestors in the competitive range established for the top four rated bidders and included the three protestors in discussions.  Tab 149, AR 3180–81.  Accordingly, the GAO dismissed the protest as academic, and the competitive range now compromised seven bidders, with all other bidders removed from competition.  *See* Tab 69, AR 2121.

The Agency then held discussion with the seven bidders in the revised competitive range, solicited final quote revisions, and completed its evaluation of the final quotes on Factors 2–5.  Tab 149, AR 3184.  The Selection Official "adopt[ed] the [Technical Evaluation Team's] ratings and rationale" for each quote and conducted a best value trade-off analysis resulting in the final ranking of bidders:

| | Quoter by Rank | Factor 2 Technical Approach | Factor 3 Mgmt. Approach | Factor 4 Key Personnel | Factor 5 Past Performance | Factor 6 Price |
|---|---|---|---|---|---|---|
| 1 | Electrosoft Services, Inc. | Superior | Good | Superior | Superior | ███████ |
| 2 | SOFTEK FEDITC, LLC | Superior | Satisfactory | Superior | Superior | ███████ |
| 3 | AttainX, Inc. | Superior | Satisfactory | Superior | Superior | ███████ |
| 4 | SiloSmashers, Inc. | Superior | Satisfactory | Good | Superior | ███████ |
| 5 | ███████ | Satisfactory | Satisfactory | Superior | Superior | ███████ |
| 6 | Steel Point Solutions, LLC | Satisfactory | Satisfactory | Satisfactory | Satisfactory | ███████ |
| 7 | ███████ | Good | Good | Unsatisfactory | Neutral | ███████ |

Tab 151, AR 3252; *see id.* at AR 3262.

Ultimately, the Agency concluded that "[a]warding to more than four (4) [bidders] would create an unnecessary administrative burden on the government with little additional benefit" and that the four highest rated bidders "had differentiating technical strengths which warranted higher pricing than Steel Point." *Id.* at AR 3266. On September 18, 2025, the Agency emailed the four eventual awardees, Electrosoft Services, Inc. (Electrosoft), SOFITC3, LLC (SOFITC3), AttainX, Inc. (AttainX), and Silosmashers, Inc. (SiloSmashers) with congratulations and draft contracts. Tabs 97–97a, 102–102a, 122–122a, and 130–130a at AR 2339–2427, 2445–2446, 2849–2938, 2963–3052. Those draft contracts indicated that performance was expected to begin on September

25, 2025. *Id.* Notably, however, the awardees' performance did not begin on September 25, 2025, and still had not begun by January 29, 2026, when the Court conducted Oral Argument.[2]

Days after circulating the draft contracts to the awardees, on September 30, 2025, the Agency issued the final awards via a signed Blanket Purchase Agreement to the four highest rated bidders, which had previously received the draft contracts. Tab 151, AR 3266. In support of its final awards, the Agency executed its Price Evaluation on September 29, 2025, and its Technical Evaluation Report and Source Selection Decision on September 30, 2025. Tab 150 at AR 3242; Tab 149 at AR 3179; Tab 151 at AR 3266.

On October 7, 2025, Steel Point filed this protest in the United States Court of Federal Claims. ECF No. 1. The four awardees (collectively, Intervenor-Defendants) intervened, and SOFITC3 filed a Motion to Dismiss. ECF Nos. 12, 19, 23, 24, 47. Following the October 17, 2025 Initial Status Conference, the Court issued a Scheduling Order on October 18 that combined the briefing schedules for SOFITC3's Motion to Dismiss with the parties Cross-Motions for Judgment on the Administrative Record (MJAR). ECF No. 46 (Scheduling Order). On consent of the parties, the Court also held as moot Plaintiff's Motion for a Temporary Restraining Order and Preliminary Injunction. *See* Scheduling Order at 2. On January 29, 2026, the Court conducted Oral Argument on the pending motions. *See* Minute Entry dated January 29, 2026; *see also* OA Tr.

---

[2] At Oral Argument, Agency counsel stated that the Agency "had not issued any task orders under this Blanket Purchase Agreement." Transcript dated January 29, 2026 (ECF No. 82) (OA Tr.) at 84:9–11. Plaintiff's counsel then asserted that part of the contract *had* started, and that "as of October 16th, at least two task orders had been issued and 2.34 percent of the contract had been started." *Id*. at 84:23–25. However, Agency counsel clarified that those two task orders "have not yet been issued. They are in the review process and expect to be issued, signed within the next two weeks with performance to start or award by March 1st. So those task orders have not been issued." *Id*. at 85:3–7. After that clarification, all parties agreed on the record that performance under this contract had not yet begun. *See id*. at 85–86.

6

## II.    Motion to Dismiss

In its Amended Complaint, Plaintiff stated that after entering discussions with the Agency, it was "disappointed to discovery [sic] that the Agency was assessing awardees based on a numerical calculation of strengths and significant strengths[,]" while the RFQ "noted only an adjectival scoring method when strengths or weaknesses were identified." ECF No. 38 (Amended Complaint) ¶¶ 22–23.[3]    Intervenor-Defendant SOFITC3 initially filed a Motion to Dismiss Plaintiff's Complaint pursuant to *Blue & Gold Fleet, L.P. v. United States*, 492 F.3d 1308, (Fed. Cir. 2007).[4] ECF No. 23 (SOFITC3 Motion to Dismiss). Specifically, SOFITC3 argued that "the entire basis for Steel Point's complaint relies on information that it learned during discussions. Plaintiff challenges the Agency's evaluation as inconsistent with the RFQ's evaluation criteria based on the Agency's alleged assessment of ratings based on a numerical calculation of strengths." SOFITC3 Motion to Dismiss at 5. Accordingly, SOFITC3 moved to dismiss Plaintiff's Complaint (and subsequently, Plaintiff's Amended Complaint) based on a waiver of claims under *Blue & Gold*, as it contended that Plaintiff had known about the alleged calculation discrepancy during discussions. *See* SOFITC3 Motion to Dismiss at 6; ECF No. 60 (SOFITC3 MJAR) at 3 n.2 ("Although SOFITC3's Motion to Dismiss was filed prior to Steel Point's Amended Complaint . . . there was no change to the Amended Complaint that impacts SOFITC3's Motion to Dismiss").

---

[3] Plaintiff filed its Amended Complaint on October 15, 2025, but made no substantive changes from its original Complaint. *Compare* ECF No. 1 (Compl.) *with* Am. Compl. Plaintiff merely corrected its name from the erroneous "Steel Point Solutions, Inc." to the corrected "Steel Point Solutions, LLC." ECF No 38-1 (Amended Complaint Ex. 1) at 1.

[4] Under *Blue & Gold* "[i]t is settled law that 'a party who has the opportunity to object to the terms of a government solicitation ... and fails to do so prior to the close of the bidding process waives its ability to raise the same objection subsequently in a bid protest action in the Court of Federal Claims.'" *Newimar S.A. v. United States*, 160 Fed. Cl. 97, 121 (2022), *aff'd*, No. 2022-1949, 2023 WL 8534614 (Fed. Cir. Dec. 11, 2023) (quoting *Blue & Gold Fleet, L.P. v. United States*, 492 F.3d 1308, 1313 (Fed. Cir. 2007)).

However, at Oral Argument, Plaintiff indicated it was no longer pursuing the argument regarding the numerical calculation of strengths. *See* OA Tr. at 16:22–25 ("The Court: But this is not an argument that you are pursuing anymore in your complaint? [Plaintiff] Mr. Walsh: As to the counting alone, that's correct Your Honor."). As Plaintiff disavowed this argument, SOFITC3 responded, "I don't think it's any barrier to you resolving this case that we need a decision on the Motion to Dismiss. So if you want to deem it moot based upon representations here and what was in the briefing, I think that's fine, Your Honor." OA Tr. at 20:6–11. Accordingly, on consent of the moving party, the Court denies as moot SOFITC3's Motion to Dismiss.

## III.    Cross-MJARs

Having resolved SOFITC3's Motion to Dismiss, the Court now turns to the parties' Cross-Motions for Judgment on the Administrative Record.

### A.    Standard of Review

In a bid protest, this Court applies the standard of review from the Administrative Procedure Act (APA). *See* 28 U.S.C. § 1491(b)(4) ("In any action under this subsection, the courts shall review the agency's decision pursuant to the standards set forth in section 706 of title 5."). The APA standard requires a reviewing court to determine whether an agency's action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). When a bidder alleges that the procurement official's decision was arbitrary or capricious, the Court reviews "whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion." *Dell Fed. Sys., L.P. v. United States,* 906 F.3d 982, 992 (Fed. Cir. 2018) (quoting *Banknote Corp. of Am., Inc. v. United States*, 365 F.3d 1345, 1351 (Fed. Cir. 2004)). The decision lacks a rational basis when the agency "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the

evidence before the agency, or . . . is so implausible that it could not be ascribed to a difference in view of the product of agency expertise." *Ala. Aircraft Indus., Inc.-Birmingham v. United States*, 586 F.3d 1372, 1375 (Fed. Cir. 2009) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

Where the Court finds that an agency decision lacked a rational basis, the Court must also evaluate the factual question of prejudice. *Sys. Stud. & Simulation, Inc. v. United States*, 22 F.4th 994, 998 (Fed. Cir. 2021); *WellPoint Mil. Care Corp. v. United States*, 953 F.3d 1373, 1377 (Fed. Cir. 2020). A protestor establishes prejudice by showing "that there was a 'substantial chance' it would have received the contract award but for" that error. *Sys. Stud. & Simulation*, 22 F.4th at 998 (quoting *Bannum, Inc. v. United States*, 779 F.3d 1346, 1353 (Fed. Cir. 2015)). A protestor cannot prevail if it does not establish prejudice. *DynCorp Int'l, LLC v. United States*, 10 F.4th 1300, 1308 (Fed. Cir. 2021) ("[T]o prevail in a bid protest, a protestor must show a significant, prejudicial error in the procurement process."); *DevTech Sys., Inc. v. United States*, 176 Fed. Cl. 297, 313 (2025).

In the Court of Federal Claims, bid protests are adjudicated under Rule 52.1(c), which provides an expedited trial on a "paper record, allowing fact-finding by the trial court." Rule 52.1(c) of the Rules of the United States Court of Federal Claims (Rule(s)); *Bannum*, 404 F.3d at 1356 (referencing Rule 56.1, which was replaced by Rule 52.1(c)). Unlike at summary judgment, genuine disputes of material fact do not preclude the Court from granting a motion for judgment on the administrative record. *Bannum*, 404 F.3d at 1357. This Court is empowered to provide any relief, including declaratory or injunctive relief, that it deems proper. 28 U.S.C. § 1491(b)(2); *Oak Grove Techs., LLC v. United States*, 116 F.4th 1364, 1375 (Fed. Cir. 2024).

### B.     Whether the Agency Acted Rationally

Plaintiff contends Defendant acted irrationally by (i) providing only a post hoc rationalization of its award decisions, (ii) treating its quote disparately compared to other bidders, and (iii) acting contrary to the terms of the RFQ.  Defendant argues that the Agency's evaluation was reasonable; it acted rationally with respect to all three points alleged by Plaintiff.  For reasons stated below, the Court agrees with Defendant.

### 1.     Whether The Agency's Rationale for its Decision is a Post Hoc Rationalization

It is well-established that post hoc explanations by an agency of its decision are insufficient to support that decision as rational.  *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 419, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971) ("These affidavits were merely 'post hoc' rationalizations, . . . which have traditionally been found to be an inadequate basis for review."); *DynCorp Int'l*, 10 F.4th at 1316 ("It's true that an agency cannot rely on a new rationale for an old decision."); *IAP Worldwide Servs., Inc. v. United States*, 159 Fed. Cl. 265, 286 (2022) ("*[P]ost hoc* explanations for agency decisions ordinarily will be rejected.").  Here, Plaintiff argues that the "Technical Review of the offers in the Competitive Range, their Price Analysis and the Source Selection Decision were all drafted and dated *after* the Contracting Specialist sent draft contracts to the awardees, with the clear consent of the Contracting Officer who is copied on the emails." ECF No. 54 (Pl. MJAR) at 15–16 (emphasis in original).  Accordingly, Plaintiff asserts that the Agency's Technical Review, Price Analysis, and Source Selection Decision (issued on September 29 and 30, 2025) amount to post-hoc rationalizations of the award because the Agency had already presented draft contracts to the four awardees (on September 18, 2025).  *See* Pl. MJAR at 16. Plaintiff contends that because the Agency's rationalization of its decision was post hoc, this Court cannot consider it.  *See* Pl. MJAR at 16–17.

10

In response, Defendant argues that there is no need to consider a post-hoc rationalization, but for a different reason; Defendant asserts that it issued its rationale for the awards contemporaneously with the issuance of the award contracts.  Specifically, Defendant counters that the Agency's September 18, 2025 congratulatory emails, which Plaintiff labels "effective awards[s]" were merely "draft awards for review."  Def. MJAR at 20 (citing Tab 130, AR 2963). Defendant points out that "[a]wards were finalized through signed blanket purchase agreements sent on September 30, 2025"; a contention it states supported by the record.  Def. MJAR at 20 (citing Tab 152, AR 3267).  Defendant concludes that the "[S]ource [S]election [D]ecision and [T]echnical [E]valuation [R]eport are dated that same day, and are therefore 'contemporaneous' with DHS's award decision."  *Id.* (citing Tab 149, AR 3179; Tab 151, AR 3266).

In support of its position, Plaintiff cites two cases from the Court of Federal Claims.[5]  First, Plaintiff references *Jacobs Technology Inc. v. United States*, for the well-established and non-controversial point that "[t]he Supreme Court has held that post hoc rationalizations that are a part of the administrative record should not be relied upon as the basis for reviewing an agency's decision." 100 Fed. Cl. 198, 208 (2011) (citing *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 50, *Citizens to Preserve Overton Park*, 401 U.S. at 419, and *In re Sang Su Lee*, 277 F.3d 1338, 1345 (Fed.Cir.2002)); *see* Pl. MJAR at 16–17.  Plaintiff also relies on *Clarke Health Care Products, Inc. v. United States*, 149 Fed. Cl. 440, 446–47 (2020), which states that "[a]ny justification for a decision should be documented during the decision making process."  *Clarke Health*, 149 Fed. Cl. at 446 (citing *CRAssociates, Inc. v. United States*, 95 Fed. Cl. 357, 376 (2010)).  In *Clarke Health*,

---

[5] While not binding on this Court, opinions issued by other judges of the Court of Federal Claims may be persuasive where the reasoning is sound.  *Newimar, S.A. v. United States*, 163 Fed. Cl. 240, 253 n.7 (2022) (quoting *Almanza v. United States*, 136 Fed. Cl. 290, 296 (2018) ("[T]his Court is not bound by the decisions of other judges on the Court of Federal Claims.")

the court examined a U.S. Department of Veterans Affairs (VA) procurement in which plaintiff challenged VA's voluntary corrective action in response to a GAO protest—a form of active litigation. *Clarke Health*, 149 Fed. Cl. at 444. The VA informed the GAO of the voluntary corrective action on March 10 and 11, 2020, and the VA began the corrective action on March 27, 2020. *Id.* However, the only justification in the administrative record for that corrective action was a contracting officer's April 2, 2020, memorandum, written more than three weeks after the VA had told the GAO it would take corrective action. *Id.* at 446. Accordingly, the court found that the agency could not rely upon that non-contemporaneous explanation (*i.e.*, post hoc rationalization) in the administrative record to justify its decisions. *See id.* at 447. The court explained that "[a]ny justification for a decision should be documented during the decision making process." *Id.* at 446; *see also CRAssociates, Inc.*, 95 Fed. Cl. at 376 (2010) (explaining that the requirement for contemporaneous explanation reinforces the agency's obligation to use the relevant data to articulate a satisfactory explanation for its action "before, not after, it renders a decision"). Plaintiff contends that *Clarke Health* is applicable to this case. Pl. MJAR at 17.

Intervenor-Defendant AttainX distinguishes *Clarke Health* from the present case, pointing out that the memo in *Clarke Health* "was created in the heat of litigation, precisely the type of evidence this Court repeatedly has explained is deserving of little to no weight." ECF No. 61 (AttainX MJAR) at 21; *see Clarke Health*, 149 Fed. Cl. at 446 (three weeks after corrective action was announced, CO wrote memorandum justifying corrective action during GAO protest). In contrast, as AttainX argues, the Agency "finalized its evaluation and award decision documentation well before any litigation by Plaintiff, and, indeed, before the Agency made its final awards and provided notifications to the unsuccessful quoters." AttainX MJAR at 21–22. AttainX concludes:

12

> The Court should decline Plaintiff's request to ignore the Agency's final evaluation and award decision documents, all of which are consistent with the remainder of the record and all of which were finalized before the Agency made its final award decisions and issued final BPAs to the awardees, merely because they were signed shortly after the Agency notified four quoters of "draft award[s]."

*Id.* at 22 (emphasis omitted).

In support of its contention that the circulation of draft awards does not render a later Source Selection Decision or Technical Evaluation Report a post hoc rationalization, Intervenor-Defendant AttainX also cites *Bean Stuyvesant, LLC v. United States*, 48 Fed. Cl. 303 (2000). In that case, the defendant pointed to the contracting officer's Source Selection Decision document (dated three days after its Competitive Range Determination memorandum), which the court accepted as a contemporaneous explanation, stating:

> This document was not made in response to plaintiff's protest and there is no evidence, based on the discussions above regarding plaintiff's poor scores for its Technical Approach, that the Corps used or needed this document for a 'post-hoc rationalization', as plaintiff claims. Moreover, the Source Selection Determination memorandum is a credible document since the rationale contained therein is consistent with the administrative record and merely sets forth, in more detail, the reasoning behind the Corps
> decision.'

48 Fed. Cl. 303, 339 (2000) (citations omitted). There, the court determined that it would "review the Source Selection Determination in conjunction with the Competitive Range Determination memorandum to determine whether the CO considered price in her decision." *Id.* AttainX argues that, as in *Bean Stuyvesant*, here, there is no evidence that the Technical Evaluation Report or Source Selection Decision were prepared in anticipation of litigation. AttainX MJAR at 18.

The Court agrees with Defendant and Intervenor-Defendants and adopts their reasoning. First, Plaintiff's post hoc argument fails because the awards were issued on the same day as the Source Selection Decision and the Technical Evaluation Report. As Defendant notes, Plaintiff does not dispute that "(1) the source selection decisions and technical evaluation are dated

13

September 30, 2025; and (2) the awards were finalized and sent to awardees that same day." ECF No. 72 (Def. Reply) at 16; *see* ECF No. 64 (Pl. Resp.) at 20. These actions (the final awards, the Source Selection Decision, and the Technical Evaluation Report), which all occurred on September 30, 2025, were contemporaneous. *See, e.g.*, Tab 152, AR 3267 (AttainX Award); Tab 153 (Electrosoft Award); Tab 156, AR 3453 (SiloSmashers Award); Tab 157, AR 3547 (SOFITC3 Award); Tab 151, AR 3252–66 (Source Selection Decision); Tab 149, AR 3179–241 (Technical Evaluation Report). Accordingly, there can be no post hoc rationalization where, as here, the Agency's rationalization of its action and the action itself occurred at the same time. *See id*; see also *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 23 (2020) ("Considering only contemporaneous explanations for agency action also instills confidence that the reasons given are not simply "convenient litigating position[s]" (quoting *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 155 (2012)).

For the same reason, *Clarke Health* is factually distinct from the present matter. That case involved an official memorandum issued by an Agency after taking final corrective action. *See Clarke Health*, 149 Fed. Cl. at 444. Importantly, there, the court found that the memorandum amounted to a post hoc rationalization, made three weeks post-award, because it "was not made contemporaneously with the decision making process." *Id.* at 446. As noted, here, unlike in *Clarke Health*, the Agency's rationale and its final contracts and awards were issued contemporaneously. *See, e.g.*, Tab 152, AR 3267 (AttainX Award); Tab 153 (Electrosoft Award); Tab 156, AR 3453 (SiloSmashers Award); Tab 157, AR 3547 (SOFITC3 Award); Tab 151, AR 3252–66 (Source Selection Decision); Tab 149, AR 3179–241 (Technical Evaluation Report). The Agency merely sent draft contracts roughly two weeks prior to the final Agency action on September 18, 2025.

14

Tabs 97–97a, 102–102a, 122–122a, and 130–130a at AR 2339–2427, 2445–2446, 2849–2938, 2963–3052.

The draft contracts sent via email to the eventual awardees on September 18, 2025 are the only evidence to which Plaintiff points in support of its contention that the Agency's rationale was inappropriately constructed post hoc. *See* Pl. MJAR at 15–16 (citing Tabs 97–97a, 102–102a, 122–122a, and 130–130a at AR 2339–2427, 2445–2446, 2849–2938, 2963–3052). However, draft contracts are just that—drafts.[6] *See Madison Servs., Inc. v. United States*, 90 Fed. Cl. 673, 679 (2009). Indeed, an agency's notification of its "stated intention" is not final because a draft decision "leaves room for [the agency] to change course." *Id.* (quoting *Tokyo Kikai Seisakusho, Ltd. v. United States*, 529 F.3d 1352, 1360 (Fed. Cir. 2008)). Nor has Plaintiff demonstrated based on the record before the Court why the eventual Source Selection Decision and Technical Evaluation Report were rendered post hoc simply because draft contracts were sent to the eventual awardees.

Additionally, Plaintiff's briefs do not overcome the arguments raised by Defendant and Intervenor-Defendants' MJARs—Plaintiff's briefs merely reassert the same failed conclusions based on *Clarke Health*. Plaintiff continues to argue that because the Agency purportedly "made awards" (i.e., September 18, 2025, draft contracts) before issuance of the Source Selection Decision, there could be no contemporaneous assessment. Pl. Resp. at 23. However, as noted

---

[6] At Oral Argument, the Court asked Plaintiff's counsel for authority indicating that draft contracts constitute final awards; Plaintiff's counsel stated that he could not present any. OA Tr. 32:23–33:2 ("THE COURT: We don't have any cases about this scenario where a draft goes out and I'm to consider it final? Mr. Walsh [Plaintiff's Counsel]: I have not, Your Honor. I do not have any case law."). Defendant's Counsel stated, "Well, draft contract[s] are just drafts. I think even in this specific case, even indicating that performance would start on September 25th, that wasn't even true because it ended up happening after September 30th, after the final awards were sent out." OA Tr. 55:22–56:1. Intervenor-Defendant AttainX's counsel stated: "I don't think a draft award is a final award." OA Tr. 79:6–7.

15

above, the Administrative Record simply does not support that contention; it is undisputed that the Agency made its awards via issuance of final contracts, on September 30, 2025. Tab 152, AR 3267 (AttainX Award); Tab 153 (Electrosoft Award); Tab 156, AR 3453 (SiloSmashers Award); Tab 157, AR 3547 (SOFITC3 Award).

Plaintiff's repeated assertions of post hoc analysis fare no better in its Response than in its MJAR and fail to adequately address the arguments Defendant raised regarding the contemporaneous Agency award and rationale. As Plaintiff has failed to establish or cite any authority for the proposition that the Agency's circulation of unsigned draft contracts constitutes arbitrary or capricious agency action, especially in the face of a contemporaneously-issued final award, Source Selection Decision, and Technical Evaluation Report, Plaintiff has failed to demonstrate that the Agency engaged in prohibited post hoc reasoning or otherwise irrational reasoning for its award decisions.

2.    **Whether the Agency Disparately Evaluated Plaintiff's Quote**

Next, Plaintiff argues that the Agency acted arbitrarily because it allegedly "was held to different standards than other awardees," specifically with respect to the Agency's evaluation of (i) Factor 3 – Management Approach, and (ii) Factor 4 – Key Personnel. Pl. MJAR at 18, 19–22. To prevail on a disparate evaluation claim, the Federal Circuit has clearly instructed that a protestor must demonstrate that the agency unreasonably downgraded its proposal for deficiencies that were 'substantively indistinguishable' or nearly identical from those contained in other proposals." *Office Design Grp. v. United States*, 951 F.3d 1366, 1372 (Fed. Cir. 2020). The Circuit further explained that "[i]f a protestor does not [meet the threshold], then the court should dismiss the claim. To allow otherwise would give a court free [rein] to second-guess the agency's discretionary determinations underlying its technical ratings." *Id*. at 1373 (citing *E.W. Bliss Co.*

16

*v. United States*, 77 F.3d 445, 449 (Fed. Cir. 1996) (The court "will not second guess" the "minutiae of the procurement process in such matters as technical ratings . . . which involve discretionary determinations of procurement officials.")).

As described further below, Plaintiff has failed to meet the standard for disparate evaluation, namely, that it was substantively indistinguishable from other bidders with respect to Factors 3 and 4. Accordingly, Plaintiff cannot establish disparate treatment. Plaintiff therefore fails to establish that the Agency acted in an arbitrary and capricious fashion; instead, the record reflects that the Agency acted properly within its broad discretion in assigning the Plaintiff the ratings it did.

a)       **Factor 3 – Management Approach**

Plaintiff alleges that "significant errors" marred the Agency's evaluation of Factor 3 – Management Approach. Pl. MJAR at 20. Specifically, Plaintiff compares its quote to that of Intervenor-Defendant Electrosoft, and claims that the Agency treated it disparately from Electrosoft because the Technical Evaluation Team (TET) recognized Electrosoft's "███████ ████████████████████████████" as beneficial but purportedly ignored Plaintiff's similar ████████████. *Id.* at 21 (citing Tab 149, AR 3196–97). Plaintiff alleges that proper recognition of its similar management approach would have resulted in a similar Factor 3 rating as Electrosoft (i.e., "Good"). *Id.* at 22.

Defendant argues that Plaintiff "fails to demonstrate that its quote received disparate treatment because it cannot establish that its quote was 'substantively indistinguishable' from Electrosoft's quote." Def. MJAR at 17 (citations omitted). Supporting that premise, Electrosoft contends that "Steel Point focuses solely on Electrosoft and Steel Point's ████████████ ████████████████████████████████████████████████, as if that small detail somehow makes the two unique proposals indistinguishable for Factor 3." ECF No. 65

17

(Electrosoft MJAR) at 12. To the contrary, Electrosoft asserts that it "discusses ████████ ████████████████ in a markedly different and much more detailed fashion than Steel Point, and its Factor 3 rating was not given simply because of those ████████████." *Id.* Electrosoft continues by comparing its Factor 3 section with Steel Point's. *See id.* at 12–14; *compare* Tab 35e, AR 753, 755–56 *with* Tab 137, AR 3119. Electrosoft concludes:

> Steel Point's proposal merely says, we have these ████████████. For ████████, Steel Point simply states that it "leverages" ████████, while Electrosoft over multiple pages of its proposal links its ████████ to sections of the statement of work, and explains and demonstrates how it utilizes ████████. These are not "substantively indistinguishable" proposals for ████████. Similarly, for ████ ████████████, Steel Point simply mentions it has it, while Electrosoft weaves ████ into its approach with ████████. The proposals on these points are not substantively indistinguishable.

Electrosoft MJAR at 14 (citing Tab 137, AR 3119).

The Court, taking heed of the Federal Circuit's admonition against "second-guess[ing] the agency's discretionary determinations underlying its technical ratings" must review whether Plaintiff has established that its quote for Factor 3 was "substantively indistinguishable" from Electrosoft's quote. *Office Design Grp.*, 951 F.3d at 1373. If Plaintiff cannot establish substantive indistinguishability, the Court must stop its analysis there. *Id.* ("If a protestor does not [establish the substantively undisguisable standard], then the court should dismiss the claim."). The Court "will not second guess" the "minutiae of the procurement process in such matters as technical ratings . . . which involve discretionary determinations of procurement officials." *E.W. Bliss Co.*, 77 F.3d at 449 (Fed. Cir. 1996).

It is plain from the face of Electrosoft's and Plaintiff's quotes that they are not "substantively indistinguishable." First, as Defendant notes, Electrosoft incorporates more detailed discussion of its use of ████████████ and ████████████████ throughout its proposal, while Plaintiff's proposal limits its treatment of these features to a short

introduction. *Compare* Tab 35e, AR 753, 756 *with* Tab 137, AR 3119. Second, both Factor 3 – Management Approach quotes detail Management teams comprised of entirely different individuals with different professional experience. *Compare* Tab 35e, AR 754 *with* Tab 137, AR 3125; *see Golden IT, LLC v. United States*, 177 Fed. Cl. 118, 145 (2025) (citing *Office Design*, 951 F.3d at 1372) ("named key personnel are inherently different – they're specific people after all – and resumes are by their nature very rarely 'substantively indistinguishable' from each other."). For example, while each submitted ███████████████ in their Management Approach section, Electrosoft details ████████████████████████████████, and specifically names the ████████████████████████████████████████, and ████████████. *See* Tab 35e, AR 754, figure 2-2. Meanwhile, Plaintiff's ████████ ████ merely illustrates connections among ████, and only names ██████████████ ████. *See* Tab 137, AR 3125, figure 7. The parties' two suggested ██████ ██████ each have unique ██████, with Electrosoft's proffered candidate having ████████████████. *See* Tab 135, AR 3078 *with* Tab 35d, AR 719. Additionally, Electrosoft's quote highlights ██ ████████████████████████████," and highlights its pursuit of ████████████████ ████████████████████████████████," while Steel Point's quote contains only the more general assertion that its personnel are enabled ████████████████████████ ████████ *Compare* Tab 35e, AR 753 *with* Tab 137, AR 3119. In sum, as these are two different management teams, one made up of entirely different individuals than the other, they cannot be substantively indistinguishable. While there is certainly overlap in these two proposals, they include readily distinguishable information, i.e., they are not substantively identical. As these are two distinguishable management teams, the Agency's differing ratings do not demonstrate disparate evaluations. *See Sterling Med. Assocs. v. United States*, 177 Fed. Cl. 550, 570 (2025).

In any event, Plaintiff merely identifies the similar aspects of its quote against Electrosoft's and proceeds to argue those technical points. *See* Pl. MJAR at 21. However, the presence of some shared approaches across a similar technical field is insufficient to constitute a substantially indistinguishable quote. *See AccelGov, LLC v. United States*, 164 Fed. Cl. 345, 362–63 (2023) (holding that technical differences between similar software test environments were substantively distinguishable). Accordingly, Plaintiff's claim of disparate treatment regarding Factor 3 fails because Plaintiff did not establish that its quote was substantively indistinguishable from Electrosoft's, and therefore Plaintiff cannot demonstrate that the Agency treated Plaintiff disparately.

### b)    **Factor 4 – Key Personnel**

For Factor 4 – Key Personnel, Plaintiff alleges that despite its inclusion in the competitive range following its GAO protest, the TET "made no effort to reevaluate Steel Point's program manager's experience to ensure . . . he would be evaluated in the same fashion as the awardees." Pl. MJAR at 19. Plaintiff alleges its Program Manager (PM) had similar strengths to SiloSmashers' PM, and that the Agency overlooked those common strengths in Plaintiff's personnel while lauding them in SiloSmashers' personnel. *Id.* at 19–20. In particular, Plaintiff complains that the Agency purportedly recognized SiloSmashers' PM's ███████████████ and noted that he exceeded the "SOW requirement by having ███████████████ ████████████████████."[7] Pl. MJAR at 19 (citing Tab 149, AR 3223–24). Plaintiff points out that its PM had █████████████████ compared to SiloSmashers' ████████

---

[7] Agile and Scrum are management approaches to complete projects (where Agile, the general approach or orientation, implements Scrum, the specific methodology of how one manages a project). Shayna Joubert, *Agile vs. Scrum: What's the Difference?*, Northeastern University Graduate Programs (July 1, 2024), https://graduate.northeastern.edu/knowledge-hub/agile-vs-scrum/.

20

███████████████████████████████████████████. Pl. MJAR at 20.  Accordingly, Plaintiff takes issue with its Factor 4 rating of "Satisfactory" in contrast to SiloSmashers'"Good" rating. *Id.*

Defendant argues, "though Steel Point points to some similarities . . . its quote is demonstrably distinct from that of SiloSmashers — each quoter proposed a different individual with substantively different credentials."  Def. MJAR at 16 (*comparing* Tab 135, AR 3078–80 *with* Tab 120, AR 2840–42).  Defendant concludes that "[b]ecause it is not irrational for DHS to assign different ratings to the credentials of two different individuals, the record does not support Steel Point's disparate treatment claim." *Id.* (citing *Office Design Grp.*, 951 F.3d at 1372–73).  In its brief, SiloSmashers argues that these two individual personnel are distinct, and that individuals, being individuals, are more difficult to be found "substantively identical."  ECF No. 62 (SiloSmashers MJAR) at 16; *see Golden IT, LLC*, 177 Fed. Cl. 118, 145 (2025) (citing *Office Design Grp.*, 951 F.3d at 1372) ("[N]amed key personnel are inherently different – they're specific people after all – and resumes are by their nature very rarely 'substantively indistinguishable' from each other.").

The Court agrees with Defendant and Intervenor-Defendant SiloSmashers.  Plaintiff does not demonstrate, and the record does not support, that its Factor 4 quote is substantially indistinguishable from SiloSmashers.  *See* Pl. Reply at 8–11.  Plaintiff merely identifies the similarities it *does* share with SiloSmashers to take issue with the Agency's conclusion.  *Id.*  However, quotes for Factor 4 – Key Personnel, by definition, reflects unique individuals.  Specifically, the Court notes that SiloSmashers' proposed Program Manager had a ████████ ████████████████████████████ the requesting Agency.  Tab 120 at AR 2839 (emphasis in original).  Plaintiff's proposed Project Manager had experience ███████████████████. *See*

Tab 135 at 3080. The Court makes no value judgment regarding the individuals' prior experience—the weight afforded to such private or public sector experience is squarely in the domain of the Agency. *See Golden IT, LLC*, 177 Fed. Cl. 118, 138 (2025) (deferring to the agency's discretion in evaluating a proposed manager's years of experience, when the agency was not constrained from doing so by the terms of the Solicitation). The Court merely notes that the experiences listed are substantively different.

The proposition that individual key personnel are distinguishable finds support in *Golden IT, LLC v. United States*, 177 Fed. Cl. 118 (2025). The plaintiff in *Golden IT* alleged that the government had misevaluated the quoted key personnel ratings because the plaintiff's program manager received a lower determination despite allegedly being "substantively indistinguishable" from the awardee's program manager. *Golden IT*, 177 Fed. Cl. at 144 (quoting *Office Design Grp.*, 951 F.3d at 1372). However, agency evaluation of key personnel is a subjective, not objective, requirement because individuals "[a]lmost by definition, . . . cannot be considered 'nearly identical.'" *Id.* at 145 (quoting *Office Design Grp.*, 951 F.3d at 1372). There, when faced with the task of comparing different individuals to attempt to discern whether disparate evaluation had occurred, the court concluded that

> [c]omparing the resumes at issue in this case requires substantive expertise that this Court lacks; concomitantly, the agency has broad discretion to assign different ratings to resumes that may appear very similar to someone without technical expertise in the key personnel's field. Thus, Golden's unequal treatment argument fails to even get off the ground. This Court agrees with the government . . . that, as a factual matter, the awardees' proposed key personnel are sufficiently distinguishable from each other . . . such that this Court would be merely second guessing the agency if it were to side with Golden.

*Id.* at 145.

The significant discrepancy in the type of prior professional experience between the two companies evinces the fact that these two quotes clearly cannot be said to be substantively

indistinguishable. *Compare* Tab 120 at AR 2839, *with* Tab 135 at 3080. Here, Plaintiff's argument hinges on the level of experience of each project manager, a resume determination to which the Agency is afforded "broad discretion to assign different ratings to resumes that may appear very similar to someone without technical expertise in the key personnel's field." Pl. MJAR at 20; *Golden IT*, 177 Fed. Cl. at 145. Again, as Plaintiff fails to meet the substantively indistinguishable standard, the Court cannot find that disparate ratings were the result of Agency error.

3.    **Whether the Agency's Assessment of Factor 5 – Past Performance Violated of the RFQ or Was Otherwise Arbitrary and Capricious**

Plaintiff does not allege a disparate evaluation claim for Factor 5 – Past Performance. Rather, Plaintiff argues that the Agency violated the RFQ because the Agency "ignored the RFQ's direction that it 'will review all Past Performance Data submitted with the quotation.'" Pl. MJAR at 24. Specifically, Plaintiff first complains that a report it submitted reflecting its prior past performance in the Contractor Performance Assessment Reporting System (CPARS) was not reviewed by the Agency. *Id.* CPARS is a "web enabled application used to document and evaluate contractor performance on awarded contracts that meet/exceed the minimum dollar threshold required for reporting. These evaluations are then marked available for government users in a source selection." *About This Site*, cpars.gov, https://www.cpars.gov/cparsweb/about (last visited Mar. 1, 2026). Plaintiff states that, despite this direction, "***no*** assessment by either TET was made of the quality of Steel Point's performance on this relevant contract effort because 'the CPARS report could not be located.'" *Id.* (citing Tab 43 at AR 1824; Tab 149 at AR 3238) (emphasis in original). Plaintiff concludes that "[h]ad simplest effort been made to 'review all Past Performance data submitted with the quotation,' Steel Point's 'satisfactory' rating based on only two contracts would have easily achieved 'superior.'" *Id.* at 25. Accordingly, much of the dispute regarding Factor 5 centers around this missing CPARS report.

23

Second, Plaintiff complains that the Agency "took no effort to ask Steel Point for any information regarding this contract [relevant to the missing CPARS report] when it had discussions with Steel Point." *Id.* at 25. Accordingly, Plaintiff contends that the Agency acted arbitrarily in not raising this issue with Plaintiff in discussions. *See id.* at 25–26.

With respect to Plaintiff's first argument, Defendant counters that the Agency reviewed "all three" of Plaintiff's past performance submissions. Def. MJAR at 18 (citing Tab 149, AR 3238–40). Despite the missing CPARS report, Defendant argues, the "record demonstrates" that the Agency "still reviewed the past performance data for Steel Point's second submission in accordance with the RFQ because the agency considered its type, performance period, scope of work, contract value, contract size, contract scope and complexity, and relevance to the SOW requirements." *Id.* (citing Tab 149, AR 3239–40). As the Agency reviewed all the information it was provided, Defendant argues it "fulfilled its obligation under the RFQ to 'review all Past Performance data submitted with quotations.'" *Id*. at 19 (citing Tab 27, AR 360).

Regarding Plaintiff's second argument, Defendant responds that the record demonstrates the Agency tried to locate the CPARS report, but regardless, "the RFQ contains no obligation for DHS to find additional past performance data on Steel Point's behalf . . . [p]articularly so where Steel Point had ample opportunity to provide its own past performance information, including CPARS reports." *Id.* (citing Tab 149, AR 360; Tab 27 AR 354–55). Defendant asserts that "the RFQ states the solicitation of additional information by DHS [is] optional." *Id*. (citing Tab 27, AR 360).

In determining whether the Agency acted arbitrarily in failing to consider the missing CPARS report in its evaluation of Factor 5, the Court first examines the RFQ, which states, with respect to Factor 5 – Past Performance:

24

The Government **may** also use information available from other sources to evaluate a Quoter's Past Performance, which may include Federal, State, and local Government agencies, published media, electronic databases, and the CO's knowledge of and previous experience with the service being acquired. Databases such as Contractor Performance Assessment Reporting System (CPARS), or other Past Performance assessment tools **may** be used. The Government **can** exercise its right to verify past performance. The government **may** contact references other than those provided by the quoter and may consider the results in its evaluation.

Tab 27 at AR 360 (emphasis added). The RFQ explicitly uses permissive language which indicates the Agency may review CPARS reports, leaving the issue to the Agency's discretion. *See Orion Tech., Inc. v. United States*, 704 F.3d 1344, 1349 (Fed. Cir. 2013) ("Th[e] language is permissive, not mandatory, reserving to the [Government] discretion to decide[.]") No imperative to track down missing CPARS reports exists in the language of the RFQ; rather, the RFQ expands on materials the Agency may use in its review of Past Performance. Tab 27 at AR 360.

Plaintiff fails to demonstrate that the RFQ required the Agency to find a missing CPARS report that Plaintiff could have attached to its own quote. Accordingly, Plaintiff fails to demonstrate that the Agency violated the RFQ by an inadequate review of Plaintiff's past performance. Rather, as demonstrated by Defendant, the Agency "simply reviewed what was available to it *i.e.*, Steel Point's submissions, and thereby fulfilled its obligation under the RFQ to 'review all Past Performance data submitted with quotations.'" Def MJAR at 18–19 (citing Tab 27, AR 360). Proceeding with the information that the quoter itself provided to the Agency comports with the RFQ and is not arbitrary or capricious action.

Turning to Plaintiff's second argument—that the Agency should have raised the issue of the missing CPARS report in discussions with the Plaintiff—Plaintiff relies on *Q Integrated Cos. v. United States*. 126 Fed. Cl. 124 (2016), *appeal dismissed*, 691 Fed.Appx. 906 (Fed. Cir. 2016), *motion for relief from judgment denied*, 131 Fed. Cl. 125 (2017). Plaintiff argues that *Q Integrated* "explained the need for the procurement agency to include discussions regarding past performance

25

information impacting the consideration of the agency's ability to award a contract." Pl. MJAR at 27. In that case, the court concluded that "during its discussions, the government failed to disclose to Q Integrated that its past performance submission either showed 'significant weaknesses' or constituted 'adverse past performance information,' in contravention of FAR § 15.306(d)(3) and the definitional terms of the solicitation." *Q Integrated*, 126 Fed. Cl. at 145.

However, Defendant successfully distinguishes the present case from *Q Integrated*. As Defendant notes, in *Q Integrated*, the court found error where the agency "affirmatively misstated there were no weaknesses or adverse past performance information associated with [an offeror]'s proposal." *Id.* at 146. Further, in *Q Integrated*, "adverse past performance information" included "past performance information that would rise to the level of a deficiency or significant weakness." *Id.* at 144. Here, however, Plaintiff does not allege that the Agency made affirmative misstatements regarding Plaintiff's past performance (and the record is devoid of any such misstatements), a key distinguishing fact from those present in *Q Integrated*. The case is simply of no moment here. In any event, as noted, the record does not demonstrate that the missing CPARS report was a "significant weakness," as evidenced by Plaintiff's rating of "Satisfactory" for Factor 5 – Past Performance. *See* Tab 149, AR 3238; Tab 27, AR 360 (defining "Satisfactory" as "likely that the quoter will successfully perform the required effort"). Accordingly, for this additional reason, the missing CPARS report was not a "significant weakness or adverse past performance information[,]" even under *Q Integrated*, and the Agency did not act in an arbitrary manner in not raising that issue in discussions. *Q Integrated*, 126 Fed. Cl. at 144–46.

Therefore, for all the reasons stated above, Plaintiff's claim of arbitrary and capricious Agency action based on the failure to raise the missing CPARS report in discussions fails.

4.     **Whether the Agency's Best Value Analysis was Rational**

In a FAR Part 8.4 best value procurement, "the Agency is neither expected nor required to document every decision it makes in rigorous detail." *Integrated Fin. & Acct. Sols., LLC v. United States*, 161 Fed. Cl. 475, 496 (2022) (quoting *22nd Century Techs., Inc. v. United States*, No. 21-1137, 2021 WL 3856038, at *10 (Fed. Cl. July 21, 2021)).   Further, "the Federal Circuit's precedent makes clear that this Court is to provide the deference to the Agency's best value tradeoff." *Sirius Fed., LLC v. United States*, 153 Fed. Cl. 410, 423 (2021) (citing *Med. Dev. Int'l, Inc. v. United States*, 89 Fed. Cl. 691, 702 (2009) ("A court reviewing a best value procurement agency action must be highly deferential, and the agency that made the determination in question is presumed to have acted in a reasonable and rational manner.") (citing *Advanced Data Concepts, Inc. v. United States*, 216 F.3d 1054, 1057 (Fed. Cir. 2000) (additional citation omitted))).   The Federal Circuit explicitly instructs that, when evaluating an agency best value determination, "the contracting officer ha[s] even greater discretion than if the contract were to have been awarded on the basis of cost alone." *Galen Med. Assocs., Inc. v. United States*, 369 F.3d 1324, 1330 (Fed. Cir. 2004).   Accordingly, this Court is to afford both leeway to the Agency's documentation of its action and even greater deference to the Agency in a best value procurement.

Plaintiff contends that the best value analysis was inherently flawed because of the allegedly erroneous analyses of Factors 3–5. Pl. MJAR at 31.  Plaintiff argues that "[h]ad a proper assessment of Steel Point's offer been performed, providing it the proper strengths the same as other offerors and the proper corresponding adjectival ratings, it would have been an awardee under this contract." *Id*.  Plaintiff additionally argues that "[t]he savings represented by its offer over the other offers clearly rendered it among the top four." *Id*.

Defendant points to the discretion afforded an agency in a best value procurement and explains the Agency's action.  *See* Def. MJAR at 21–22; *see also NMB Singapore Ltd. v. United*

27

*States*, 557 F.3d 1316, 1319 (Fed. Cir. 2009) ("[W]hile its explanations do not have to be perfect, the path of [the agency's] decision must be reasonably discernable to a reviewing court."). Defendant asserts that "[h]ere, the path is documented, clear, and straightforward — it starts with DHS's evaluation of quoters' proposed technical capabilities, and ends with the agency's ranking of quotes according to its best value determination." *Id.* at 22 (citing Tab 149, AR 3184; Tab 151, AR 3252).

The Court agrees with Defendant. As noted, Plaintiff has failed to demonstrate that the Agency's analyses of Factors 3–5 were arbitrary, capricious, or contrary to the RFQ. Accordingly, its argument regarding the best value analysis, which is premised on purported errors in Factors 3–5, necessarily fails. As Plaintiff's only argument that the best value analysis was flawed rests on the proposition that errors were made in the evaluation of technical factors, and it has not adequately demonstrated such errors, this claim fails. The Court, as required by the Federal Circuit, affords broad discretion to the Agency in best value procurements. *See Galen Med.*, 369 F.3d at 1330. Plaintiff has demonstrated no good reason why the Court should interfere with the Agency's best value determination and question the Agency's discretionary decision; accordingly, the Court declines to do so here.

Regardless of the deference afforded the Agency by the Court in best value procurements, the RFQ itself reserved deference to the Agency's discretion regarding Factor 6 – Price. The RFQ stated that the Agency was permitted to decide if "a price premium [was] warranted due to technical merit," and if so, to grant the award to "other than the lower priced quotation." Tab 151, AR 3254. Therefore, even if Plaintiff could prove that its adjectival ratings for Factors 3–5 were erroneously low and should have been commensurate with the successful bidders, which it does not, a lower price alone does not ensure Plaintiff would have been selected for award. As the

28

Agency did not violate the broad discretion it was afforded in technical evaluations, or the discretion afforded it by its own RFQ, and as the Agency is afforded similarly broad discretion in its best value evaluation, Plaintiff has failed to show arbitrary action.

### C.    Whether Steel Point Demonstrated Prejudice

"A bid protest proceeds in two steps.  First . . . the trial court determines whether the government acted without rational basis or contrary to law when evaluating the bids and awarding the contract." *Bannum*, 404 F.3d at 1351.  As Plaintiff has failed to establish the Agency acted without rational basis or contrary to law, Plaintiff's protest fails.  Accordingly, the Court need not reach the question of prejudice in this case.  The Court only needs to address prejudice "if" Plaintiff establishes a violation of procurement law.  *Sys. Stud. & Simulation, Inc.*, 22 F.4th at 998 ("We first ask 'whether the agency's actions were arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law'; **if so**, we ask whether the error was 'prejudicial.'" (emphasis added) (internal quotations omitted) (quoting *Office Design Grp.*, 951 F.3d at 1371)); *see also Clarke Health*, 149 Fed. Cl. at 445) ("**If** the court finds that the agency acted in error, the court **then** must determine whether the error was prejudicial) (emphasis added) (citing *Bannum*, 404 F.3d at 1351)).

## IV.    Motion for Injunctive Relief

The Court considers four factors when deciding whether to grant injunctive relief: (1) whether the plaintiff has succeeded on the merits, (2) whether the plaintiff will suffer irreparable harm if the court withholds injunctive relief, (3) whether the balance of hardships to the respective parties favors granting an injunction, and (4) whether the public interest is served by granting an injunction.  *Centech Grp., Inc. v. United States*, 554 F.3d 1029, 1037 (Fed. Cir. 2009).

If Plaintiff cannot establish its success on the merits, the Court need not proceed to the other factors, as "[t]here can be no injunctive relief without a corresponding prevailing claim."

29

*Obsidian Sols. Grp., LLC v. United States*, 54 F.4th 1371, 1376 (Fed. Cir. 2022).  In other words, a "plaintiff who cannot demonstrate success upon the merits cannot prevail upon a motion for injunctive relief." *Insight Pub. Sector, Inc. v. United States*, 161 Fed. Cl. 760, 817 (2022) (quoting *By Light Pro. IT Servs., Inc. v. United States*, 131 Fed. Cl. 358, 367 (2017)); *see also Dell Fed. Sys.*, 906 F.3d at 999 ("[P]roving success on the merits is a necessary element for a permanent injunction[.]").  Accordingly, as Plaintiff's protest fails on the merits, it is not entitled to injunctive relief.

*****

## CONCLUSION

Accordingly, for the reasons stated above, the Court **DENIES** Steel Point's Motion for Judgment on the Administrative Record (ECF Nos. 54 and 57); **GRANTS** Defendant's Motion for Judgment on the Administrative Record (ECF No. 58); **GRANTS** SOFITC3's Motion for Judgment on the Administrative Record (ECF No. 60); **GRANTS** AttainX's Motion for Judgment on the Administrative Record (ECF No. 61); **GRANTS** SiloSmasher's Motion for Judgment on the Administrative Record (ECF No. 62); **GRANTS** Electrosoft's Motion for Judgment on the Administrative Record (ECF No. 65); and **DENIES AS MOOT** SOFITC3's Motion to Dismiss (ECF No. 23).  The Clerk of Court is **DIRECTED** to enter Judgment accordingly.

The parties are directed to **CONFER** and **FILE** a Notice by **March 17, 2026**, attaching a proposed public version of this Sealed Memorandum and Order, with any competition-sensitive or otherwise protected information redacted.

IT IS SO ORDERED.



*Eleni M. Roumel*
ELENI M. ROUMEL
Judge

March 3, 2026
Washington, D.C.

31